**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CORAZON BANCOLITA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 6576 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Four and a half years ago, Corazon Bancolita applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§416(i), 423. (Administrative Record (R.) 156-59). She claimed that she became disabled as of December 21, 2012, and was unable to work due to insulin dependent, type 2 diabetes and neuropathy, carpal tunnel syndrome, depression, and cataracts. (R. 204). As almost four years went by, Ms. Bancolita's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Ms. Bancolita filed suit under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). Ms. Bancolita asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**

Ms. Bancolita is 58 years old, and was 54 when her insured status expired in March 2014. She has a solid work history (R. 185-86), including seventeen years working in the airline industry cleaning the cabins of planes. (R. 229). Most recently, until August 2012, she worked as a home caregiver, assisting disabled patients. (R. 227). That job was a taxing one, involving lifting patients and doing their housework. (R. 227 ). Ms. Bancolita has a number of medical problems. She has type 2 diabetes, which she has struggled with controlling and which has resulted in symptoms including neuropathy in her hands and feet and edema in her legs. (R. 292, 297, 326, 328, 329, 332, 334, 336, 369). She has carpal tunnel syndrome as well (R. 292, 329), and she is obese, with a BMI generally around 35. (R. 290-96). Perhaps not surprisingly, given all this, Ms. Bancolita began treatment for depression in July of 2015. (R. 344).

After a sixteen-minute administrative hearing (R. 39, 50) – at which Ms. Bancolita, represented by counsel, and a vocational expert testified – the ALJ determined she was not disabled. The ALJ found that Ms. Bancolita had severe insulin-dependent diabetes, severe obesity, and severe bilateral carpal tunnel syndrome. (R. 25). The ALJ found that her depression did not qualify as a severe impairment because there was no record of complaints or symptoms prior to the expiration of her insured status. (R. 25). The ALJ concluded that none of Ms. Bancolita's impairments, singly or in combination, amounted to a condition that met or equaled an impairment assumed to be disabling in the Commissioner's listings. (R. 26).

The ALJ then determined that Ms. Bancolita could perform "less than a full range of light work." (R. 27). That meant she could stand or walk for six hours a day, and lift or carry up to 20 pounds. *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016). The ALJ added that she could not

climb ladders, ropes, or scaffolds, could only occasionally – one-third of the day, SSR 83-10, 1983 WL 31251, at *5-6 (1983) – balance, stoop, kneel, crouch, and crawl, and could only occasionally – again, up to one-third of the day – use her hands for gross manipulation bilaterally. (R. 27). Along the way, the ALJ said that she found Ms. Bancolita's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." (R. 28). The ALJ didn't say what symptoms or limiting effects Ms. Bancolita was alleging. (R. 28-29).

The ALJ then noted that treatment had been routine and conservative, and summarized the medical evidence. (R. 28-29). She said she gave little weight to a statement from Ms. Bancolita's daughter because she was not a medical professional or impartial third party. (R. 29). She gave some weight to the opinions from state agency consultants, saying that she felt Ms. Bancolita was a bit more limited in gross manipulation. (R. 28). She gave no weight to the opinion from Ms. Bancolita's treating psychiatrist that Ms. Bancolita was disabled due to depression because treatment did not begin until after the expiration of Ms. Bancolita's insured status and the doctor's records did not show abnormal behavior. (R. 29). And, finally, the ALJ gave little weight to the opinion of Ms. Bancolita's treating physician because it did not cite to the medical record, did not indicate when Ms. Bancolita's insulin-dependence began, and did not jibe with treatment records. (R. 29). For example, the ALJ didn't believe Ms. Bancolita would need to lie down for three hours during the day because there was no "indication of her needing home health care or nursing home placement." (R. 29).

The ALJ then found that Ms. Bancolita could not perform her past work cleaning airplane cabins because it had been medium work and was now beyond her capacity for a limited range of light work. (R. 29). As an individual closely approaching advanced age, with a high school education, and no transferable job skills, Ms. Bancolita would be found "not disabled" under the Medical Vocational Guidelines if she had the capacity for a full range of light work. (R. 30). As she did not, the ALJ instead relied on the testimony of the vocational expert that Ms. Bancolita could still perform jobs like bakery line worker, fruit distributor, and dealer accounts investigator. (R. 30). Accordingly, the ALJ concluded that Ms. Bancolita was not disabled and not entitled to DIB under the Social Security Act. (R. 31).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017)

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical

bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

### III.

We have to begin with the ALJ's credibility finding – now called the evaluation of symptoms, SSR 16-3p – to the extent there was one. As already noted, the hearing in this case was just sixteen minutes long. The transcript of the testimony at the hearing covered just eleven pages (R. 40-50) and fewer than five of those transcribe Ms. Bancolita's testimony. So, we can make a pretty solid estimate that the ALJ spent fewer than eight minutes questioning Ms. Bancolita. During those few minutes, the ALJ asked her about her family, how much she weighed, her education, whether she served in the military, what kind of home she lived in, her children, whether she received public assistance, and her job history. The ALJ never once asked Ms. Bancolita about her impairments and certainly not about, as her decision puts it, "the intensity, persistence and limiting effects of these symptoms." (R. 28).

5

"A well-settled proposition regarding social security disability hearings is that '[i]t is a basic obligation of the ALJ to develop a full and fair record.'" *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991). It would certainly seem that this obligation ought to include asking a claimant what's wrong with her or how she feels or what she able to do around the house. But, then again, not much can be accomplished in eight minutes. Indeed, courts have had issues with much longer hearings being too perfunctory and too superficial. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1052 (6th Cir. 1983)(". . . the administrative law judge did not fulfill his responsibility in this case. The hearing was brief. It lasted a mere 25 minutes, and was fully transcribed in approximately 11 pages."); *Sears v. Bowen*, 840 F.2d 394, 403 (7th Cir. 1988)(". . . this appears to be a case where the ALJ relied too much on the fact that [the claimant] had an advocate acting on his behalf and failed to affirmatively develop a proper administrative record. As noted, the transcript is 29 pages long; the hearing lasted only 32 minutes."); *Novak v. Berryhill*, No. 15 CV 50236, 2017 WL 1163733, at *5 (N.D. Ill. Mar. 29, 2017)("The bottom line is that the substantive portion of plaintiff's and his mother's testimony covered roughly nine pages out of the 33-page transcript."); *McCaster v. Colvin*, No. 12 C 4059, 2014 WL 2158967, at *9 (N.D. Ill. May 23, 2014)(". . . the ALJ's questioning of [plaintiff] at the hearing was brief and perfunctory. The hearing lasted approximately 27 minutes and was recorded in fewer than 15 pages. . . . [plaintiff's] actual testimony was recorded in fewer than 12."); *Hull v. Colvin*, No. 11 C 6589, 2013 WL 3771230, at *6 (N.D. Ill. July 17, 2013)("The hearing, which lasted approximately 26 minutes, is recorded in 14 transcript pages. . . ."). While the length or brevity of a benefits hearing is not dispositive of whether the ALJ fulfilled the obligation to adequately develop the record, a perfunctory hearing may be indicative of such a failure. *Id.* But, regardless of the brevity or length

of a hearing, the question is always whether "the relevant evidence about [a plaintiff's] condition still managed to find its way into the record . . . ." *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997).

Here, as she failed to ask any pertinent questions, the ALJ's only source for Ms. Bancolita's allegations regarding "the intensity, persistence and limiting effects of [her] symptoms" is the record, which includes a standard Form claimants fill out in the course of applying for benefits. (R. 238-45). The ALJ did at least refer to this Form when she was considering whether Ms. Bancolita's impairments somehow met the listing for major dysfunction of a joint. The ALJ noted that plaintiff could drive, could prepare meals and use kitchen utensils, shop using a credit card, and load a dishwasher, all of which meant she could use her hands to grasp. (R. 26). "But '[a]n ALJ cannot disregard a claimant's limitations in performing' daily activities." *Meuser v. Colvin*, 838 F.3d 905, 913 (7th Cir. 2016); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). And that's clearly what the ALJ did here.

Ms. Bancolita did report that she could drive, but only "twice or twice a week." (R. 241). She also said that her daughter drove her shopping. (R. 242). We don't know how far or how long she can drive because the form doesn't ask that and neither did the ALJ. *Cf. Cullinan v. Berryhill*, 878 F.3d 598, 604 (7th Cir. 2017)("The dearth of information about what [plaintiff] did, how she got to the nursing home, and how long a period of time she assisted her cousin renders the ALJ's reliance on this activity unreasonable."). But, suffice it to say, driving once a week doesn't really say much about using one's hands to grasp five days a week for two or three hours a day, every day. Moreover, it doesn't necessarily undermine a claim that the use of one's hands is limited due to carpal tunnel syndrome and diabetic neuropathy.

Similarly, Ms. Bancolita did report that she prepares meals. But again, only once a week and even then, she can only manage a sandwich or a frozen dinner. (R. 240). The rest of the time, she orders take out or her family prepares meals. (R. 240). Why doesn't she cook more? She says it's because she can't grasp utensils with hands. (R. 240). That's the exact opposite of what the ALJ said she could do. And, although the ALJ ignored it, Ms. Bancolita specifically said that she "need[ed] help to . . . put dishes in Dishwasher machine." (R. 240). Finally, not much need be said about the ALJ mentioning the plaintiff's ability to use a credit card occasionally – we only know she shops once a month for clothes. (R. 241). If the ALJ meant that Ms. Bancolita's ability to swipe a credit card a couple of times a week supported a finding that Ms. Bancolita could use her hands to grasp one third of every day at work, that seems not just patently wrong but ridiculous.

To top all this off, the overarching theme to Ms. Bancolita's statements in the form about what she could do around the house was that her family had to help her with many tasks. (R. 239, 240, 241, 242). At length, she explained:

> I am so thankful and grateful with my family especially my 12 yrs old daughter. She helps me cleaning our apartment, laundry especially folding clothes, cleaning kitchen and at the same time she have [sic] good grades. I thank my son too for helping me clean my bathroom 2x a week and my daughter to cook and grocery [shop] with me sometimes.

(R. 245). Yet, the ALJ ignored multiple entries indicating that Ms. Bancolita can't do the things the ALJ says she can without help. (R. 239, 240, 241, 242, 245).

Moreover, Ms. Bancolita never said she could not use her hands to grasp at all, just that she couldn't use her hands around the house or well enough to "work full time anymore." (R. 238). So saying that she *can* grasp because she can take a credit card out of her purse once a week is

8

meaningless. (R. 238). The ALJ didn't explain why using a credit card – or doing any of the other limited activities Ms. Bancolita does – "was inconsistent with [Ms. Bancolita's] description of her pain and limited mobility. Nor is any inconsistency obvious. . . ." *Cullinan*, 878 F.3d at 603. If the ALJ was using plaintiff's activities to show that she could use her hands one third of every day at a job, that, too, is improper. The Seventh Circuit has repeatedly criticized ALJs for equating household chores – often far more extensive than what Ms. Bancolita is capable of – with the ability to hold down a full-time, five-day-a-week, job. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons...and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011)(plaintiff's "ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace.").

So, we have a sixteen-minute hearing, with just eight minutes of questions for the plaintiff, including answers. There were no questions by the ALJ about her symptoms, limitations, or what she can and cannot do. We have an exaggeration of the activities a plaintiff stated on a Form she could do, a disregard of the limitations a plaintiff said she had while performing those activities, and a disregard of the fact that she can't do many simple things without help. As such, we have a credibility finding – or evaluation of symptoms – that cannot be upheld. This case must be remanded to the Commissioner, but it is worthwhile to make a few additional points.

First, let's return to what constitutes the ALJ's credibility finding or evaluation of symptoms.

9

The ALJ said that Ms. Bancolita's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." (R. 28). This is apparently the current version of the boilerplate that has come under fire repeatedly – boilerplate 3.0 or more, it would seem. *See, e.g., Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016)(deriding "the ALJ's use of language that this court routinely has condemned as 'meaningless boilerplate' and 'backwards' analysis."); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)("The present 'template,' . . . is even worse . . . ."); *Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011)("There is no explanation of which of [claimant's] statements are not entirely credible or how credible or noncredible any of them are."); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)("It is not only boilerplate; it is meaningless boilerplate."). Importantly, this current version doesn't match what the Commissioner's regulations say the standard for evaluating allegations about symptoms is: that the ALJ must determine whether those allegations "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §416.929(a). That's not as demanding as the ALJ was here – or at least not as demanding as she said she was. So, even if the ALJ had questioned Ms. Bancolita and accurately recounted her daily activities, would she have held Ms. Bancolita's testimony to the proper standard? It seems the answer is no.

Then there is the ALJ's consideration of Ms. Bancolita's obesity, which was raised in the initial review of this case. [Dkt. # 13]. As pointed out there, obesity may have an adverse effect on a person's ability to perform even sedentary work. *See Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014). In addition, Ms. Bancolita suffers from severe diabetes with loss of sensation in both her upper and lower extremities, and pitting edema in her lower extremities. Added to the obesity, that

would certainly seem to make matters worse. *See Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014)(explaining the cumulative effects of obesity and other impairments on walking), Yet, the ALJ found Ms. Bancolita could stand or walk for six hours every day.

It's true that the ALJ said she was taking Ms. Bancolita's obesity – which the ALJ found to be a severe impairment – into account. While she said she "included the factor of claimant's obesity in the assessments of claimant's other impairments and relationships to the requirements of the listings," she never mentioned obesity again. (R. 26). The Commissioner submits that:

> [a]t step three, the ALJ specifically alluded to plaintiff's obesity in concluding that she did not meet or equal any Listed impairment. (Tr. 26). Finally, in crafting a well-supported RFC finding, the ALJ relied on evidence from doctors who directly considered her obesity. (Tr. 28).

[Dkt. #14, at 6]. But nothing in the ALJ's Opinion suggests that this is the case. Again, in addition to Ms. Bancolita's severe obesity, she suffers from severe diabetes and accompanying neuropathy in her hands and feet, and pitting edema in her legs. Yet, in assessing whether Ms. Bancolita's impairments met or equaled a listing, the ALJ clearly ignored any problems she might have standing or walking when her obesity and diabetic symptoms in her lower extremities were combined. With regard to listing 1.02, the ALJ focused on Ms. Bancolita's hands; the ALJ never mentioned the pitting edema in her legs – she said it was in her hands. (R. 26). It may well be, but the medical record shows it is in her legs (R. 328), along with neuropathy. In reference to listing 1.08, the ALJ again ignored any possible lower extremity problems, saying Ms. Bancolita "has not lost major function of the upper extremities." (R. 27). While it might be true that she has not lost *major* function in her legs, that doesn't necessarily mean that her lower extremity neuropathy and edema, exacerbated by obesity, allow her to be on her feet for six hours every day.

As for the state agency doctors the ALJ relied on for her RFC finding, they did find Ms. Bancolita's obesity was a severe impairment, but the only evidence they considered about her lower extremities was that she was able to walk 50 feet during a consultative examination. (R. 56, 57, 68, 69). The Seventh Circuit has said that "a brief excursion" like "walking for 50 feet . . . does not does not demonstrate an ability to stand for 6 hours," *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir.2011); *Thomas v. Colvin*, 534 F. App'x 546, 551 (7th Cir. 2013), which is what both the state agency doctors and the ALJ thought Ms. Bancolita could do. Against this, and the ALJ's apparent belief that edema affected only Ms. Bancolita's hands, are repeated references to decreased sensation or neuropathy in *both* Ms. Bancolita's upper and lower extremities and resultant treating physician's recommendation that she elevate her feet for about half of every workday. (R. 292, 297, 326, 328, 369). It's simply not the case that the ALJ's RFC finding – that Ms. Bancolita can be on her feet for six hours a day, five days a week – took into account both her obesity and the symptoms from her diabetes.

While it seems a stretch, at least the way the ALJ articulated it, that Ms. Bancolita can perform work requiring her to be on her feet most of the day, could Ms. Bancolita handle a job that did not require nearly so much walking and standing – a sedentary job?[1] Perhaps, but the problem with that is, as a person closely approaching advanced age, with a high school education, and no transferable work skills, Ms. Bancolita would have to be found disabled under the grid given a

---

[1] In regard to whether Ms. Bancolita could perform a job that required sitting all day, as opposed to being on her feet most of the day, it should be noted that Ms. Bancolita's treating physician opined that she had to recline for three hours a day. (R. 370). The ALJ rejected this, stating that there was no "indication of needing home health care or nursing home placement." (R. 29). As with a number of the ALJ's findings, already discussed, it is difficult to follow the path of the ALJ's reasoning here. It's unclear why a need to lie down during the day would necessarily entail home health care or nursing home placement.

capacity for a full range of sedentary work. *Compare* 20 C.F.R. Part 404, Subpart P, App. 2, Table No. 1, Rule 201.12. *with* 20 C.F.R. Part 404, Subpart P, App. 2, Table No. 1, Rule 201.21. Once a person falls into the "closely approaching advanced age" category, the Commissioner assumes that there may be a serious effect on their ability to adjust to work other than the kind they are used to. 20 C.F.R. § 404.1563(d). As a result, a capacity for light work is just about the baseline RFC necessary for finding a person over 50 not disabled. Of course, when that person has lower extremity neuropathy and edema, and is obese, an ALJ has to do a better job than the ALJ did here of explaining how that person can be on their feet for six hours a day, five days a week, every week.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for remand [Dkt. #15] is GRANTED, and the defendant's motion for an affirmance of the ALJ's decision is DENIED.[2]

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 6/7/18

---

[2] Plaintiff asks that the ALJ's decision be reversed or remanded. Reversal would mean, presumably, an award of benefits and "[i]t remains true that an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011). As the remand here comes under the Seventh Circuit's "logical bridge" requirement, an award of benefits is not appropriate without further administrative proceedings.

13